FILED
FEB 9 2007
U.S. COURT OF
FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

DECATUR HOTELS, L.L.C.

Plaintiff,

v. Case No. 07-99 C

UNITED STATES OF AMERICA,

Defendant.

## COMPLAINT

### PARTIES AND JURISDICTION

1.

Plaintiff is DECATUR HOTELS, L.L.C. ("Decatur")

2.

This claim arises from a breach of contract by Defendant, acting through the General Services Administration ("GSA"), the Federal Emergency Management Agency ("FEMA"), and Shaw Environmental, Inc. ("Shaw").

3.

Pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §609, Decatur seeks a judgment by this Court.

### FACTS

4.

Decatur owns and operates 10 hotels in the New Orleans French Quarter and Central Business District.

5.

Decatur caters primarily to tourists and, to a large extent, international tourists.

6.

After Hurricane Katrina devastated the city of New Orleans and surrounding areas on August 29, 2005, Decatur had great concern for the future of its more than 600 employees, their families, and its company.

7.

Decatur realized that, in order for it to survive, it would have to immediately get its properties back in service so that it could capture the new clientele that would exist during the rebuilding of New Orleans.

8.

Decatur immediately came to the conclusion that the hotel guests over the next year or so would be essential service personnel, infrastructure support and reconstruction, and residents needing a "base camp" upon which they could direct their own rebuilding effort, many of whom were to be provided hotel rooms by FEMA.

9.

Shortly after Hurricane Katrina, GSA, on behalf of FEMA, and Shaw contacted Decatur and agreed to utilize all of Decatur's hotels for the group described above, which it had earlier identified as the "market."

10.

The GSA contracting officers with whom Decatur repeatedly dealt include Georgia Sells ("Sells") and Michael Llewelyn ("Llewelyn"). Decatur also dealt with various representatives from

FEMA and Shaw, all of whom repeatedly confirmed that there was a contract with Decatur to rent its rooms.

11.

Being part of the "FEMA" accommodations appealed to Decatur's sense of civic duty which sentiment Decatur illustrated with a contractually agreed-to lower rate of $153 per night compared to Decatur's normal rates of $199 plus.

12.

Pursuant to the contract, GSA/FEMA was to rent Decatur's 1563 rooms for at least a seventh-month term at $153/night.

13.

Decatur spent hundreds of man hours in a short period of time accomplishing the agreement with FEMA.

14.

Decatur endeavored to return its hotels to service so that it could fulfill the contract with GSA /FEMA.

15.

Decatur spent approximately $1.75 million getting its hotels ready based on FEMA/GSA's representations that it needed Decatur's rooms immediately.

16.

Decatur spent $1.75 million even though part of the agreement with FEMA/GSA was that Shaw would do this readying work and not Decatur.

17.

Decatur hotels were inspected 3 separate times, each time satisfactorily.

18.

On or about September 8, 2006, Decatur's President Ben Marmande ("Mr. Marmande") personally shook an offered hand of Sells, who stated that "we have a deal." *See* Exhibit 1.

19.

The contract between Decatur and GSA/FEMA is memorialized by a letter that was printed on Sells' printer after making agreed upon changes. The letter states that it is "contractual in nature" and that it is "intended to outline terms and is intended to obligate the parties." *See* Exhibit 2.

20.

Sells has the original copy of the letter that was signed by Mr. Marmande. Mr. Marmande does not have a copy because he was told he would have a copy along with the "government equivalent of P.O." the next day.

21.

Mr. Marmande was told that the P.O. would refer to the letter agreement as the terms and conditions.

22.

Decatur was told that the rest of the process was a formality and final documents would be forthcoming shortly.

23.

Based on the deal with GSA/FEMA, Mr. Marmande directed the Decatur sales team to sell only daily commitments because Decatur would not get much notice from FEMA as to when it

would be occupying the rooms for the agreed-to seven-month period in order to make sure that the rooms required by GSA/FEMA would be available.

24.

Decatur turned away offers of higher rates in reliance on its agreement with FEMA. In particular, Decatur turned away $7,717,575.00 in business because it (1) could not confirm reservations due to the agreement with FEMA and (2) could not offer long-term commitments due to the agreement with FEMA. *See* Exhibit 3.

25.

Mr. Marmande also directed Decatur's sales effort exclusively toward the longer term market, stating that rooms would not be available until August 2006, due to the seven-month term agreement with FEMA.

26.

Subsequent to this agreement, Mr. Marmande received repeated assurances that the contract was complete, he was informed that: "this is a done deal, don't rent the rooms," "definitely a go, paper work is a day away, etc."

27.

On or about September 14, 2005, Mr. Marmande was also given a P.O. # and told that the Decatur contract was funded. The P.O. # is HSFE06-05-p6346. Sells stated that she could provide a P.O. # because FEMA had issued a 40-1 (Requisition and Commitment for Services and Supplies). An example of FEMA 40-1 is attached as Exhibit 4. A copy of the Order for Supplies or Services referencing the P.O. # is attached as Exhibit 5.

28.

On several occasions, Sells and others left voice messages, which Decatur has retained, reiterating the deal with Decatur.

29.

For instance, on September 19, 2005, Sells left a voice mail in which she states:

> [i]t's a go. I've got your contract, I'm ready to give it to you. They've got the documents and everything so it is a go today call me in a couple of hours and everything should be cleared up and ready to go we are just waiting for a signature here and it is definitely a go.

30.

Despite the fact that FEMA and GSA entered into a contract with Decatur to rent its rooms, FEMA and GSA violated the contract and booked approximately 15,000 to 20,000 rooms with other hotels in Louisiana, many for six-month leases, for use by various agency and outside personnel dealing with recovery from Hurricane Katrina.

31.

In November 2005, Decatur wrote a letter to GSA and FEMA requesting a ruling on its claims pursuant to 41 U.S.C. § 605. *See* Exhibit 6.

32.

On February 10, 2006, Alan Searsy ("Searsy"), a contracting officer at GSA, issued an opinion denying Decatur's claim, which Decatur's counsel received on February 16, 2007. *See* Exhibit 7.

33.

In his written opinion, Searsy found that the contract between Decatur and FEMA and GSA was not binding because: (1) because FEMA never "committed to any funding"; and (2) "Decatur

had been made aware that absent such a commitment, GSA could not enter into a contract for the lodgings." *Id.* at p. 2.

34.

Upon information and belief, however, FEMA reportedly spent as much as $11 million dollars per day on hotel rooms for residents displaced after Hurricane Katrina. *See* Exhibit 8.

35.

Additionally, no one at FEMA, GSA, or Shaw told Decatur that, absent a commitment from FEMA, a contract could not be entered. Searcy's letter also fails to identify who allegedly informed Decatur that unless and until FEMA committed money, the contract between GSA/FEMA could not be finalized.

36.

Instead, Sells and others specifically told Decatur that FEMA had agreed to fund the deal. Indeed, Decatur was informed on numerous occasions by numerous officials that the contract was "a go."

37.

Searsy found that "[o]n September 28, 2005, FEMA made a "final decision to discontinue the process of entering into any new contracts for temporary lodging." *See* Exhibit 7, p. 2.

38.

But in fact, on September 28, 2005, Llewelyn contacted Decatur to inform them that the contract would be honored. *See* Exhibit 1.

39.

Indeed, until September 29, 2005, all of the communications between Decatur and GSA and FEMA show that GSA and FEMA knew there was a contract and knew that Decatur had relied on the contract by not renting its rooms to other customers in reliance on the contract.

40.

By failing to utilize Decatur's hotel rooms after agreeing to do so, GSA and FEMA breached its contract with Decatur.

41.

Decatur has been harmed by GSA/FEMA's breach of contract and its detrimental reliance on their representations that GSA/FEMA would use Decatur's hotels to house residents displaced by Hurricane Katrina.

42.

Decatur's damages are estimated to be $43,642,867.00.

43.

Decatur's reliance on FEMA/GSA's promise to rent its rooms was reasonable. There was a tremendous need for undamaged housing after Hurricane Katrina. Decatur had undamaged rooms. Decatur knew that FEMA was looking for hotel rooms and it reasonably relied on FEMA/GSA's promise that they would use Decatur's hotel rooms.

44.

GSA and FEMA are estopped from claiming there was no contract.

**WHEREFORE**, Decatur prays that after due proceedings be had, there be judgment entered in favor of Decatur and against Defendant and that Decatur be awarded all damages to which it is entitled due to GSA/FEMA's breach of contract and Decatur's detrimental reliance on GSA/FEMA's promises, as well judicial interest, all costs and expenses, including, but not limited to attorneys' fees, and all pre-suit and pre-judgment interest from the date of judicial demand and for all other relief deemed just and equitable by this Honorable Court under the circumstances.

Respectfully submitted,

JAMES M. GARNER (Of Record)
MARTHA Y. CURTIS (Of Counsel)
KEITH L. MAGNESS (Of Counsel)
**SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C.**
909 Poydras Street - 28th Floor
New Orleans, LA 70112
Telephone: 504-299-2100
Facsimile: 504-299-2300
**ATTORNEYS FOR DECATUR HOTELS, L.L.C.**

| | |
|---|---|
| General | Talked to Georgia and Michael Llwelyn often and they have told me many times this was a "done deal" and several times "don't let the rooms go to someone else" - Michael at one point left me a voice mail saying he was frustrated and that it would happen but we had to do what we thought was right for our business. I called him and said that I was going to stay the course and he concured that there was no signals that this would not happen. I also had a forceful conversation with Joe Boyer where he said "they defintely want those rooms do let them go anywhere else" Ron Sherman has told me that we should have our document in 1-2 days, I repeated this statement to him and he acknowledged it, they knew we were holding rooms - all told I have > 100 man hours into FEMA, others in decatur probably have that much cumulatively |
| September 8, 2005 | Conversation with Joe Boyer of Shaw - FEMA inspection - GSA contract, Brad Gary is head guy - Walter Monseiur - Planner, Shaw will estimate the cost per property - **they could start repairs without lease - want all properties - "we have a deal"** |
| September 8, 2005 | Went over to meet with Georgia Sells per conversation with Joe Boyer that the deal was done but I was frustrated that nothing was moving forward. I reviewed our proposal, negotiated a rate change from 133 to 153 because GSA said that we could not have a firm 1 year, they gave on rate, I gave on term from a year to a firm 7 months. At the end of this 2-3 hours that I was at her desk, I printed the "final" version, we read the changes while Georgia also read them to someone on the phone, I then signed the document (I don't have an original copy) but GSA does, we then shook hands, Georgia said "we have a deal" and she said that I should get the document within a day. |
| September 9, 2005 | James Quinn went twice without success after being called to retrieve the document |
| September 14, 2005 | Hsfe06-05-p6346 Purchase Order was issued |
| September 14, 2005 | VM from Georgia - gona be a go and should have something in the AM |
| September 15, 2005 | Spoke with Abby - "No doubt about it" they want to get it done 504-202-4731 |
| September 15, 2005 | VM from Georgia - it's a go - got contract - call me in a couple of hours and should have documents |
| September 16, 2005 | My question is to Georgia was "Are we getting Strung along?" her answer "no, no, no, no, no, no, it is definetly a go" - I later spoke with Michael Lewellyn - "done deal" - big sticking point was our document because it was a year and it raised a bunch of red flags - he assured me that they want the rooms and said don't let the rooms go to anyone else |
| September 17, 2005 | Greg Grimsal who works for Shaw asked me to put a document together stating room availability. He also told me about the not being able to spend money upfront on the properties - I agreed. He told me that it was his understanding that once the schedule was done the deal would be done. |
| September 17, 2005 | Bob Parker - the snafu has been cleared up and paper work should be signed this AM - thanks for your cooperation and patience |
| September 20, 2005 | Conversation with Michael L. - Told me that Ron Sherman - dir of Housing Area Command has a call at 11 with the White House to "wrangle" free the deals - it has been approved this is burecratic red tape - sorry that we are hanging out there - please hang in - I told him that it cost us $130K a day for the hotels to be vacant |
| September 21, 2005 | VM from Joe Boyer - pushing the SOB like no one else - FEMA funding is the issue - waiting on funding approval - (Georgia later told me that funding was approved) |
| September 21, 2005 | VM from Michael Ll saying bureacratic red tape is holding things up |

tabbles®
EXHIBIT
1

| | |
|---|---|
| September 22, 2005 | Ron Sherman "He is fully up to speed on the issues"<br>"he was informed by counsel that he could not use federal dollars to repair private property"<br>"he wrangled with that issue for days and finally decided to "remove" repairs and refurbishment from the contracts - his interest is in hotels that are ready to go"<br>**He said that since ours are ready to go that we should have our document in 1-2 days**<br>I told him that we had other properties in Jefferson, Orleans, and one in Birmingham that Joe Boyer had interest in. He commented that he could not put any more evacuees in Alabama because the Gov thought that "he had done enough" - I responded by saying that the gov of Al should not control who we have in our hotel and he agreed but said that it would be under his "auspices" and he could not afford another "ass chewin" - he is interested in Jefferson and Orleans and wants us to work through Shaw saying that he would be a big "bottleneck"<br>I informed him that we had gotten a call from a times pic reporter on "FEMA sitting on contracts" he appreciated the heads up but said that unfortunately it was true |
| September 23, 2005 | Conversation with Michael L - Said he agrees with the premise that we have to see it through - it will happen - was not aware of the info from Sherman gave me |
| September 24, 2005 | Getting contracts done - do I have a problem with 10 separate contracts - I said no as long as the final document follows our agreement less refurbshment - should have something by Monday |
| September 25, 2005 | Conversation with David Landers - Said we should get contracts tomorrow<br>Asked how we were coming mold removal - told him that we are good<br>He asked me to call him tomorrow about meeting on Wed |
| September 25, 2005 | Lynn who was helping Georgia - Called to ask what rooms were ready - I referred her to the Greg spreadsheet and told her to ask for the accessment sheets - Lynn confirmed that the contracts should be ready by tomorrow. |
| September 25, 2005 | Georgia is staying in her hotel room to finish the contracts. |
| September 26, 2005 | Conversation with Georgia - "Definitely a go" - should get documents tomorrow - is it OK to get them one contract at a time? |
| September 26, 2005 | Conversation with David Landers - after I said that I just got chewed out in a sales meeting for holding the rooms for FEMA - David cut me off "FEMA is doing our contract right now" - "Fema will work with us as we bring rooms on line" - "the contract will be Six month contracts" |
| September 27, 2005 | I called Michael L to complain that I had a "deal" with Georgia and for him to read our agreement and that we were a firm 7 months not six. "Georgia and I shook hands - we have a deal". He said he would look into it. |
| September 27, 2005 | Lynn at GSA called Benjamin Stalter to pick up contracts |
| September 28, 2005 | Michael L called back to say that they would honor 7 months on ours. |
| September 29, 2005 | Ron Sherman - They are releasing the hotels - "the powers to be want us out of the hotel business" he said that while there may be penalties he was releasing the hotel rooms. "situation changes by the hour" - gave me Linda Black as the person to call at 504-202-4764, I called no answer (I have tried her several times) |
| September 29, 2005 | David Landers - Sheraton & Doubletree are the only done deals the goal was 10,000 and they have 900. |

| | |
|---|---|
| September 29, 2005 | Conversation with Michael Llewellyn they were told that the Mayor did not want "first responders, medical staff, evacuees, etc. – he said that the order came from the highest levels including the white house. Tad Allen is the Vice Admiral of FEMA (took Mike Brown's place. Michael then asked me if I could pursue some rooms for GSA and JFO (Joint Field Office – All FEMA) in Baton Rouge. Told him that would not happen. They currently have people in knots at the shopping center in BR. |
| September 29, 2005 | Conversation with Georgia - She said that Marriot said that Nagin denied saying that he did not want these people in hotel rooms<br>Marriot, Hilton, Hyatt are all considering sueing,<br>She was so proud of herself because she worked on getting all of the documents done so they could go out. |

www.newolreansfinehotels.com

L. Joe Boyer
Vice President
Shaw Environmental, Inc.

***Proposal for New Orleans Fine Hotels***

Mr. Boyer,

Thank you for taking the time to meet with us today. We are very excited about working with Shaw Environmental, Inc. and FEMA regarding housing evacuees.

**New Orleans Fine Hotels** owns and operates 10 unique hotels located in the most historic areas of **New Orleans**. Their distinctive properties can be found in the **French Quarter**, the **Central Business District** and on **St. Charles Avenue**. In addition to location, each hotel offers fine amenities and professional service to their guests.

*Property List*

We are happy to offer the Following 10 hotels for your use exclusively.

| Hotel Name | # of Rooms |
|---|---|
| Astor Crowne Plaza | 707 rooms |
| Parc St Charles | 123 rooms |
| Hotel LeCirque | 138 rooms |
| Historic French Market Inn | 123 rooms |
| Hotel Chateau Dupre | 59 rooms |
| Pelham Hotel | 60 rooms |
| St James Hotel | 86 rooms |
| Lafayette Hotel | 44 rooms |
| Cotton Exchange Hotel | 102 rooms |
| Holiday Inn Express | 121 rooms |
| Total Rooms | 1563 rooms |

**Our Company also has affiliations with another 575 rooms to assist you**

The higher of the Government Per Diem or $153 per night plus $1.50 per night for Stirling Properties, Inc. leasing/administrative fee will apply for all rooms. Rate is currently $153 per night with suites at 1.5x the room rate.

We anticipate all of the above rooms becoming available over the next few weeks. Rooms are paid for as occupied and Contract period shall begin once the last room is on line.

EXHIBIT
tabbles
2

*Meals*

The Astor Crowne Plaza is able to supply meals for up to 1000 people per hour. Government per-diems will apply as well.

*Improvements*

FEMA will agree to pay for any improvements needed as determined by Shaw Environmental, Inc. and agreed to by all parties.

At the conclusion of the contract term (including all exercised extensions) FEMA agrees to pay a "refurbishment cost" to refresh and repair the rooms to the point prior to occupancy.

*Parking*

Parking is available at each hotel.

*Lease Terms*

Initial Lease will be for a period of one year. FEMA shall have the right to exit after 6 months with a 30 day advance notice in writing to New Orleans Fine Hotels. In other words, the earliest that FEMA may exit would be the end of month 7 of contract term. FEMA shall have the option to extend the initial lease for 2- 6 month option periods. In order to exercise the first option period, FEMA must provide written notice to New Orleans Fine Hotels not less than 90 days prior to the end of the Initial Lease Term. In order to exercise the second option period, FEMA must provide New Orleans Fine Hotels with written notice at lease 120 days prior to the end of the initial 6 month option period. The lease terms of the option period shall be at the same terms and conditions as the Initial Lease.

This proposal is intended to be contractual in nature. The undersigned acknowledges that this letter is intended to outline terms and is intended to obligate the parties.

Sincerely,

Ben Marmande
Chief Executive Officer

**List of Lost Business due to Pending FEMA Agreement**

| Customer | Dates | Room Nights | Room Rate | Potential Revenue |
|---|---|---|---|---|
| LVI Environmental Services | 9/29-10/15/05 | 900 | $ 150.00 | $ 135,000.00 |
| Allstate Insurance Company | 9/25-12/25/05 | 11,700 | $ 159.00 | $ 1,860,300.00 |
| Army Corp of Engineers | 9/30/05-2/28/06 | 15,000 | $ 175.00 | $ 2,625,000.00 |
| Corporate Lodging | 10/1-12/1/05 | 18,000 | $ 169.00 | $ 3,042,000.00 |
| CBS Sports | 10/13-16/05 | 150 | $ 169.00 | $ 25,350.00 |
| US Marshal's Services | 10/1/05-1/1/06 | 225 | $ 133.00 | $ 29,925.00 |
| | Totals | 45,975 | $ 167.86 | $ 7,717,575.00 |

EXHIBIT

tabbies

3

## FIGURE D-5 -- SAMPLE 40-1 FORM

FEDERAL EMERGENCY MANAGEMENT AGENCY
**REQUISITION AND COMMITMENT FOR SERVICES AND SUPPLIES**

DOCUMENT CONTROL NO. 288951

See Instructions on Reverse (FAILURE TO COMPLETE OR COORDINATE ALL ITEMS ON THIS FORM MAY RESULT IN PROCESSING DELAYS)

1. PROGRAM OFFICE *(Office Symbol, Building, Room No.)* *DFO 9999DR Room 14B*
2. PROJECT OFFICER *(Name and Telephone No.)* *Susan Smith (333) 444-5555*
3. DATE OF REQUEST *November 21, 1999*
4. ESTIMATED PERIOD OF PERFORMANCE/DATE REQUIRED *Nov 23 through Nov 30, 1999*
5. TOTAL ESTIMATED COST

6. DELIVER TO: NAME *(Include Office Symbol, Building, Room No. – If different than Item 1)*
*Same as Items 1 and 2*
☐ Ship to Headquarters Services Division

7. SUGGESTED SOURCE(S): *(Name, Address, Contact, Telephone No.)*
*FarFlung Aerial Enterprises, Inc.*
*9876 Reconnaissance Road - Suite 212*
*Wickenburg, AZ 87654*
☐ Attached

8. PROJECT TITLE/DESCRIPTION OF SUPPLIES, EQUIPMENT AND/OR SERVICES *(For supplies indicate item/mode block number, item name, quantity, unit price and amount – Attach an additional sheet, if necessary)*
*Provide 9" resolution (or better) aerial photographs of Rio Grande River and environs (1/2 mile inland both sides of river) from Santa Gonzalez to Sierra Nogales. Photographs will be provided digitally within 24 hours and hard copy within 48 hours.*

9. LIST OF ATTACHMENTS
☐ SCOPE/STATEMENT OF WORK
☐ PROPOSAL EVALUATION CRITERIA
☐ INDEPENDENT GOVERNMENT ESTIMATE
☐ SECURITY CLASSIFICATION SPECIFICATIONS (DD Form 254)
☐ RECOMMENDATION FOR OTHER THAN FULL AND OPEN COMPETITION
☐ GOVERNMENT PROPERTY
☐ REPORTS AND DATA
☐ OTHER *(Specify)*

10. REFERENCES
☐ AMENDMENT/MODIFICATION TO ____________
☐ CLASSIFIED DOCUMENTS
☐ PROCUREMENT & ASSIST PLANNING DOCUMENT
☐ *(FEMA Form 40-1)* CONTROL NO. PD ____________
☐ OTHER *(Specify)*

11. JUSTIFICATION/DOCUMENTS *(Attach additional sheet, if necessary)*
*Supports information requirements of ESF's 5, 8, and 10.*

SAMPLE

12. APPROVALS – PROGRAM ADMINISTRATIVE AREA

| | |
|---|---|
| *Susan Smith* Project Officer | Date |
| *John Jones* Intermediate Approval | Date |
| *Alice Johnson* Program Head | Date |
| Other Coordination | Date |
| Other Coordination | Date |
| Other Coordination | Date |
| Other Coordination | Date |
| Other Coordination | Date |

13. APPROVALS – ADMINISTRATIVE *(Supplies and Equipment)*
Headquarters Services Division ____ Date
Contact: ____________

14. FUNDING:
*1999-06-9999-DR-4400-2507-D $45,000.*

Funds in the amount of $____________ are hereby certified available and reserved.

Certifying Officer ____ Date

15. ASSIGNMENT

| | NAME | TELEPHONE NO. | DATE PR RECEIVED |
|---|---|---|---|
| CONTRACTING/ASSISTANCE OFFICER | | | |
| CONTRACT SPECIALIST | | | |

FEMA Form 40-1, DEC 89 MGT REPLACES EDITION OF OCT 88, WHICH WILL BE USED UNTIL EXHAUSTED. 1 ACQUISITION

EXHIBIT
tabbles
4

Nov 09 05 11:27a CHATEAU DUPRE 504 962 1920 p.2

MAR. 10 2002 6:43AM FEMA NO 378 P 1

# ORDER FOR SUPPLIES OR SERVICES

PAGE 1 OF PAGES 3

IMPORTANT: Mark all packages and papers with contract and/or order numbers.

1. DATE OF ORDER: September 16, 2005
2. CONTRACT NO. (if any):
3. ORDER NO.: HSFE06-05-P-6346
4. REQUISITION/REFERENCE NO.: TN
5. SHIP TO:
a. NAME OF CONSIGNEE: FEMA – JFO (DR-1603-LA)
b. STREET ADDRESS: 1500 Main Street
c. CITY: Baton Rouge
d. STATE: LA
e. ZIP CODE: 70802
f. SHIP VIA: N/A
6. ISSUING OFFICE (Address correspondence to): Same as Block 5
7. TO:
a. NAME OF CONTRACTOR: TIN: 72-1135558
POC: Ben Marmande 504-710-1109 504-285-0966 (Fax)
New Orleans Fine Hotels
b. STREET ADDRESS: 317 Magazine
c. CITY: New Orleans
d. STATE: LA
e. ZIP CODE: 70130

8. TYPE OF ORDER

a. PURCHASE
Reference, Oral and Written Quotes
Please furnish the following on the terms and conditions specified on both sides of this order and on the attached sheets, if any, including delivery as indicated.
This purchase is negotiated under authority of FAR 13

b. DELIVERY
Except for billing instructions on the reverse, this delivery order is subject to instructions contained on this side only of this form and is issued subject to the terms and conditions of the above-numbered contract.

9. ACCOUNTING AND APPROPRIATION DATA: 2005-06-1603DR-9064-XXXX-2327-D
10. REQUISITIONING OFFICE: SAME AS BLOCK #5
11. BUSINESS CLASSIFICATION (Check appropriate box(es)): a. SMALL X b. OTHER THAN SMALL c. DISADVANTAGED d. WOMEN-OWNED
12. F.O.B. POINT: DESTINATION
13. PLACE OF: a. INSPECTION: DESTINATION b. ACCEPTANCE: FEMA
14. GOVERNMENT B/L NO.:
15. DELIVER TO F.O.B. POINT ON OR BEFORE (Date): AS REQUIRED
16. DISCOUNT TERMS: NET 30

17. SCHEDULE (See reverse for Rejections)

| ITEM NO. (a) | SUPPLIES OR SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
|---|---|---|---|---|---|---|

New Orleans Fine Hotels will provide 1,563 rooms for a period of one (1) year. FEMA shall have the right to exit after six (6) months with a 30-day advance notice in writing to New Orleans Fine Hotels. The rate will be $153.00 per night which totals ~~$43,642,887.00~~ from the date of award 10-1-05 to 10-1-06. These rooms will provide alternative housing solution and hotel rental for displaced applicants. FEMA will have the right to exit after six (6) months with a 30-day notice in writing to New Orleans Fine Hotels. FEMA may exit at the end of the seventh month of the contract term. FEMA shall have the option to extend the initial rental for 2-6 month option periods. In order to exercise the second option period, FEMA must provide New Orleans Fine Hotels with written notice at least 120 days prior to the end of the initial six (6) month option period. The rental terms of the option period shall be at the same terms and conditions as the initial lease. The Government is obligated only to rental of 1,563 rooms on this contract. Prices to the Government equal to or better than those charged to your most favored commercial customers for comparable services under similar terms and conditions.

Project Officer: David L. Porter, Housing Area Command Telephone: 202-646-3883

87,285,735

Invoices: Send original invoice to address in Block 21 below and copy to address in Block 5. Be sure and put the Disaster Number DR-1603-LA on the invoice and read pages 2 and 3.

FEDERAL TAX EXEMPT #52-122-7911

SEE BILLING INSTRUCTIONS ON REVERSE

18. SHIPPING POINT:
19. GROSS SHIPPING WEIGHT:
20. INVOICE NO.:
17(h) TOT. (Cont. pages)
21. MAIL INVOICE TO:
a. NAME: FEMA DISASTER FINANCE CENTER (540) 542-7300
b. STREET ADDRESS (or P.O. Box): P.O. BOX 800 ATTN: VENDOR PAYMENTS (DR-1603-LA)
c. CITY: BERRYVILLE
d. STATE: VA
e. ZIP CODE: 22611
17(i) GRAND TOTAL: NTE $43,642,887.00

22. UNITED STATES OF AMERICA BY (Signature)
23. NAME (Typed): GEORGIA SELLS 504-202-4748 or 817-978-8659
TITLE: CONTRACTING/ORDERING OFFICER

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION NOT USABLE

OPTIONAL FORM 347 (REV. 6/95)
PRESCRIBED BY GSA/FAR 48 CFR 53.213(a)

EXHIBIT 5

## SUPPLEMENTAL INVOICING INFORMATION

If desired, this order (or copy thereof) may be used by the Contractor as the Contractor's invoice, instead of a separate invoice, provided the following statement, (signed and dated) is on (or attached to) the order; "Payment is requested in the amount of $________. No other invoice will be submitted." However, if the Contractor wishes to submit an invoice, the following information must be provided; contract number (if any), order number, item number(s), description of supplies or services, sizes, quantities, unit prices, and extended totals. Prepaid shipping costs will be indicated as a separate item on the invoice. Where shipping costs exceed $10 (except for parcel post), the billing must be supported by a bill of lading receipt. When several orders are invoiced to an ordering activity during the same billing period, consolidated periodic billings are encouraged.

## RECEIVING REPORT

Quantity in the "Quantity Accepted" column on the face of this order has been. ☐ inspected, ☐ accepted, ☐ received by me and conforms to contract. Items listed below have been rejected for the reasons indicated.

| SHIPMENT NUMBER | PARTIAL / FINAL | | DATE RECEIVED | SIGNATURE OF AUTHORIZED U.S. GOV'T REP. | DATE |
|---|---|---|---|---|---|
| TOTAL CONTAINERS | | GROSS WEIGHT | RECEIVED AT | TITLE | |

## REPORT OF REJECTIONS

| ITEM NO. | SUPPLIES OR SERVICES | UNIT | QUANTITY REJECTED | REASON FOR REJECTION |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## ADDITIONAL PURCHASE ORDERS AND CONDITIONS

### FAR 52.252-2 CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

This order incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available

| | | |
|---|---|---|
| 52.203-3 | GRATUITIES | APR 1984 |
| 52.212-4 | CONTRACT TERMS AND CONDITIONS-COMMERCIAL ITEMS | FEB 2002 |
| 52.222-3 | CONVICT LABOR (applicable above $2,500) | AUG 1996 |
| 52.222-21 | CERTIFICATION OF NONSEGREGATED FACILITIES (applicable above $10,000) | FEB 1999 |
| 52.222-26 | EQUAL OPPORTUNITY | FEB 1999 |
| 52.222-35 | EQUAL OPPORTUNITY FOR SPECIAL DISABLED AND VIETNAM VETERANS OF THE VIETNAM ERA AND OTHER ELIGIBLE VETERANS | DEC 2001 |
| 52.222-36 | AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS WITH DISABILITIES (applicable above $10,000) | JUN 1998 |
| 52.222-37 | EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA | DEC 2001 |
| 52.222-41 | SERVICE CONTRACT ACT OF 1965 | MAY 1989 |
| 52.225-1 | BUY AMERICAN ACT—BALANCE OF PAYMENT PROGRAM—SUPPLIES (applicable above $2500) | FEB 2000 |
| 52.225-13 | RESTRICTIONS ON CERTAIN FOREIGN PURCHASES (applicable above $2500) | FEB 2000 |
| 52.247-34 | F.O.B. DESTINATION | NOV 1991 |
| 52.247-35 | F.O.B. DESTINATION, WITHIN CONSIGNEE'S PREMISES | APR 1984 |
| 52.247-65 | F.O.B. ORIGIN, PREPAID FREIGHT-SMALL PACKAGE SHIPMENTS | JAN 1991 |

### FAR 52.212-4(g) INVOICES (MAY 2001)

The contractor shall submit an original invoice and three copies (or electronic invoice, if authorized.) to the address designated

F

LAW OFFICES OF

# SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C.

PERMANENT ADDRESS:
TWENTY-EIGHTH FLOOR
909 POYDRAS STREET
NEW ORLEANS, LOUISIANA 70112

http://www.shergarner.com

TEMPORARY ADDRESS:
ESSEN CENTRE
5353 ESSEN LANE, SUITE 650
BATON ROUGE, LOUISIANA 70809

LEOPOLD Z. SHER[1]
JAMES M. GARNER[2]
ELWOOD F. CAHILL, JR.
RICHARD P. RICHTER
STEVEN I. KLEIN[1,8]
PETER L. HILBERT, JR.
MARIE A. MOORE[3]
DEBRA J. FISCHMAN
ROBERT P. THIBEAUX
DARNELL BLUDWORTH[2]
MARTHA Y. CURTIS[2]
NEAL J. KLING
KEITH A. KORNMAN[2]
JOSHUA S. FORCE[2,4]

DEBORAH J. MOENCH
DOROTHY S. WATKINS LAWRENCE[2]
JOHN T. BALHOFF, II
ALVIN C. MIESTER, III
KAREN T. HOLZENTHAL
ASHLEY S. BERGERON
ELIZABETH S. ROBINS
CHRISTOPHER T. CHOCHELES
EMMA E. DASCHBACH
HOWARD T. BOYD, III[2]
RYAN D. ADAMS
TERRI B. LOUGHLIN
ELIZABETH A. READY
JACOB A. AIREY

THOMAS J. MADIGAN, II[5]
KEVIN M. McGLONE
SHARONDA R. WILLIAMS[5,9]
CHAD P. MORROW
LAUREN L. HUDSON[3]
MARIE-PIERRE RICHELLE[5]
ELLEN M. PIVACH
JEFFREY D. KESSLER[7]

OF COUNSEL:
TIMOTHY B. FRANCIS
DAVID A. MARCELLO

[1] LAW CORPORATION
[2] MEMBER OF LOUISIANA AND TEXAS BARS
[3] MEMBER OF LOUISIANA AND ALABAMA BARS
[4] MEMBER OF LOUISIANA AND CALIFORNIA BARS
[5] MEMBER OF LOUISIANA AND GEORGIA BARS
[6] MEMBER OF LOUISIANA AND MISSISSIPPI BARS
[7] MEMBER OF NEW YORK BAR
[8] BOARD CERTIFIED TAX ATTORNEY LOUISIANA BOARD OF LEGAL SPECIALIZATION
[9] REGISTERED TO PRACTICE BEFORE THE UNITED STATES PATENT AND TRADEMARK OFFICE

ALL OTHERS LOUISIANA BAR

TEMPORARY NUMBERS:
TEL (225) 757-2185
FAX (225) 757-7674
jgarner@shergarner.com

Decatur \ Katrina

November 16, 2005

**VIA CERTIFIED MAIL, FACSIMILE, AND EMAIL WHERE OBTAINABLE**

**CERTIFIED MAIL NUMBER 7007 2510 0005 7226 3630**
**FAX: 202-501-0800; EMAIL: stephen.perry@gsa.gov**
**Mr. Stephen A. Perry**
Administrator of General Services Administration
U.S. General Services Administration
18TH and F Sts., NW
1800 F Street, NW
Washington, D.C. 20405-0000

**CERTIFIED MAIL NUMBER 7001 2510 0005 7226 3647**
**FAX: 817-978-4743; EMAIL:michael.llewelyn@gsa.gov**
Mr. Michael G. Llewellyn
819 Taylor Street 12B145
Fort Worth, TX 76102-0000

**CERTIFIED MAIL NUMBER 7001 2510 0005 7226 3654**
**FAX: 817-978-8634; EMAIL: georgia.sells@gsa.gov**
Ms. Georgia D. Sells
Contracting Officer
819 Taylor Street 6A06
Fort Worth, TX 76102-0000

EXHIBIT
tabbies
6

**CERTIFIED MAIL NUMBER 7001 2510 0005 7226 3661**
**Mr. R. David Paulison,** Acting Director;
**Vice Admiral Thad Allen**, United States Coast Guard, Federal Coordinating Officer
**Mr. Ronald Sherman,** Housing Area Command, Federal Coordinating Officer for
Federal Emergency Management Agency
500 C Street, SW
Washington, D.C. 20472

Re: FEMA/GSA Lease with Decatur Hotels, L.L.C.
P.O. #: hsfe06-05-p6346
Our Ref: 20407.0017

Dear Sirs/Madam:

We represent Decatur Hotels, L.L.C. ("Decatur"). In our October 14, 2005 correspondence to you, which we enclose, we informed you that our client owns and operates 10 hotels in the New Orleans French Quarter and Central Business District.

After Hurricane Katrina, Decatur achieved an agreement with Shaw Environmental, Inc. ("Shaw") and your agencies, the General Services Administration ("GSA") and the Federal Emergency Management Agency ("FEMA"), to utilize all of Decatur's hotels. Being part of the "FEMA" accommodations appealed to Decatur's sense of civic duty which sentiment Decatur illustrated with a contractually agreed-to lower rate of $153 per night compared to Decatur's normal rates of $199 plus. GSA/FEMA was to rent its 1563 rooms for at least a seventh-month term at this rate. Decatur spent hundreds of man hours in a short period of time accomplishing the agreement with FEMA.

Moreover, Decatur spent approximately $1.75 million accelerating the "get ready" effort as it was repeatedly told that FEMA needed the rooms immediately. Decatur spent this money even though part of the agreement was that Shaw would do this readying work and not Decatur. Decatur hotels were inspected 3 separate times (each time satisfactorily), and Decatur reached agreement with many parties representing your agencies.

Decatur's President Ben Marmande personally shook an offered hand of a GSA contracting officer stating "we have a deal." The deal is memorialized by a letter that was printed on the contracting officer's printer after making agreed upon changes which states that it is "contractual in nature" and that it is "intended to outline terms and is intended to obligate the parties." The GSA contracting officer has the original of which Mr. Marmande does not have a copy because he was told he would have a copy along with the "government

LAW OFFICES OF
SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, L.L.C.



equivalent of P.O." the next day. A copy of this letter is enclosed. The P.O. would refer to the letter agreement as the terms and conditions. The GSA contracting officers with whom Decatur repeatedly dealt include Georgia Sells and Michael Llewelyn.

At that time Decatur was told that the rest of the process was a formality and final documents would be forthcoming shortly. Prior to this handshake, Mr. Marmande had directed the Decatur sales team to sell only daily commitments because Decatur would not get much notice from FEMA as to when it would be occupying the rooms for the agreed-to seven-month period. Decatur turned away offers of higher rates in reliance on its agreement with FEMA.

After this handshake, Mr. Marmande directed Decatur's sales effort exclusively toward the longer term market, stating that rooms would not be available till August 2006, due to the seven-month term agreement with FEMA. Subsequent to this agreement, Mr. Marmande received repeated "this is a done deal, don't rent the rooms," "definitely a go, paper work is a day away, etc." Mr. Marmande was also given a P.O. # and told that the Decatur contract was funded. The P.O. # is hsfe06-05-p6346. A copy of the 40-1 Order for Supplies or Services referencing the P.O. # is enclosed.

We also have several voice mail messages from Georgia D. Sells and others, which we have saved on tape and digital recorder, confirming the contract with Decatur, including a September 19, 2005 voice mail in which Ms. Sells states:

> [i]t's a go. I've got your contract, I'm ready to give it to you. They've got the documents and everything so it is a go today call me in a couple of hours and everything should be cleared up and ready to go we are just waiting for a signature here and it is definitely a go.

Unfortunately, Mr. Marmande has now received news that FEMA was "releasing" hotel rooms as "the powers to be, wants FEMA out of the hotel business." Despite FEMA's representations, we learned that FEMA has allegedly booked 15,000 to 20,000 rooms in Louisiana, many for six-month leases, for use by various agency and outside personnel dealing with recovery from Hurricane Katrina.

As we informed you in our October 14, 2005 correspondence, Decatur has been harmed by GSA/FEMA's breach of contract and its detrimental reliance on their representations. Decatur's damages are estimated to be over $29 million. For instance, Decatur losses include, but are not limited to, revenue from: (1) LVI Environmental Services, which requested two weeks of rooms totaling 900 room nights representing $135,000.00 in revenue; (2) Allstate Insurance Company, which requested 11,700 room nights, representing $1,860,300.00 in revenue; (3) Army Corps of Engineers, which requested 15,000 room nights representing $2,625,000.00 in revenue; and (4) Corporate Lodging, which requested 18,000 room nights, representing $3,042,000.00 in revenue. These customers were denied rooms because Decatur could not guarantee their stays due to

its agreement with FEMA. Moreover, these figures do not even include the lost opportunity costs for which Decatur would continue to receive future revenue from these clients. A copy of a table showing the above-references losses is enclosed. Additionally, Decatur personnel, including Mr. Marmande, incurred approximately $50,000.00 in costs preparing for the FEMA contract. *See* attached spreadsheet itemizing personnel costs.

Below is a table illustrating Decatur's loss for each month of the contract.[1]

| | Per Contract | Actual | ADR | Percent Occupancy | Revenue | Difference |
|---|---|---|---|---|---|---|
| September | $7,174,170 | $636,245 | | | | $6,537,925 |
| October | $7,413,309 | | $120 | 95% | $5,523,642 | $1,889,667 |
| November | $7,174,170 | | $120 | 95% | $5,345,460 | $1,828,710 |
| December | $7,413,309 | | $100 | 85% | $4,118,505 | $3,294,804 |
| January | $7,413,309 | | $80 | 50% | $1,938,120 | $5,475,189 |
| February | $6,695,892 | | $80 | 50% | $1,750,560 | $4,945,332 |
| March | $7,413,309 | | $80 | 50% | $1,938,120 | $5,475,189 |
| | $50,697,468 | | | | | $29,446,816 |

Thus, pursuant to 41 U.S.C. § 605, we are hereby asserting a claim against you for breach of contract and/or detrimental reliance. We hereby certify that this claim is made in good faith, the supporting data is accurate and complete to the best of our knowledge and belief, the amount requested accurately reflects the amount for which you are liable, and that we are duly authorized to certify this claim on behalf of Decatur. Please provide us with a final written decision on our claim within the time delays provided by law.

Cordially,

Martha Curtis

James M. Garner
Martha Y. Curtis
Elizabeth A. Ready

Enclosures
cc: Mr. L. Joe Boyer
Vice President

[1] The numbers in the chart are projected numbers. Decatur's losses may be greater than the numbers reflected above.

Shaw Environmental, Inc.

Honorable Bobby Jindal (United States Representative Louisiana 1st District)
**(VIA FAX 202-226-0386)**
1205 Longworth House Office Building
Washington, D.C. 20515

Honorable Mary Landrieu (United States Senator Louisiana)
Attn: Marshall Hevron
**(VIA FAX 225-389-0660)**
707 Florida Street
Baton Rouge, LA 70801

Honorable David Vitter (United States Senator Louisiana)
**(VIA FAX 225-383-0952)**
858 Convention Street
Baton Rouge, LA 70802

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Michael G. Llewellyn
819 Taylor Street 12B145
Fort Worth, TX 76102-0000

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature X [signature] ☐ Agent ☐ Addressee

B. Received by (Printed Name) [handwritten]

C. Date of Delivery 11/18/0

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

2. Article Number
*(Transfer from service label)* 7001 2510 0005 7226 3647

PS Form 3811, August 2001 Domestic Return Receipt 102595-02-M-08

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Mr. R. David Paulison**
**Vice Admiral Thad Allen**
**Mr. Ronald Sherman**
Federal Emergency Management Agency
500 C Street, SW
Washington, D.C. 20472

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature X [signature] ☐ Agent ☐ Addressee

B. Received by (Printed Name) Alice Agyapong

C. Date of Delivery 11/23/05

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

Restricted Delivery? *(Extra Fee)* ☐ Yes

2. Article Number
*(Transfer from service label)* 7001 2510 0005 7226 3661

PS Form 3811, August 2001 Domestic Return Receipt 102595-02-M-08

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Mr. Stephen A. Perry**
Administrator of General Srvs. Adm.
U.S. General Services Administration
18TH and F Sts., NW
1800 F Street, NW
Washington, D.C. 20405-0000

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature X [signature] ☒ Agent ☐ Addressee

B. Received by (Printed Name) Theresa Robinson-Smith

C. Date of Delivery 11/23/0

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

2. Article Number
*(Transfer from service label)* 7001 2510 0005 7226 3630

PS Form 3811, August 2001 Domestic Return Receipt 102595-02-M-0

GSA

GSA Greater Southwest Region

February 10, 2006

FEB 13 2006

MARTHA Y. CURTIS

Mr. James M. Garner, Esq.
Ms. Martha Y. Curtis, Esq.
Ms. Elizabeth A. Ready, Esq.
Sher Garner Cahill Richter Klein & Hilbert, LLC
5353 Essen Lane, Suite 650
Baton Rouge, LA 70809

Dear Mr. Curtis, Ms. Garner, and Ms. Ready:

This responds to your November 16, 2005 letter asserting a claim on behalf of Decatur Hotels, LLC (Decatur) against the Federal Emergency Management Agency (FEMA) and the General Services Administration (GSA) based on a breach of a purported "contract" between the Federal Government and Decatur.

Having reviewed your letter and the matters alleged therein, I have determined that Decatur and the Federal Government never entered into a binding contractual relationship. As such, there can be no contract breach nor a valid claim based on a contract breach.

The facts show as follows:

- On or about September 10, 2005, GSA was approached by FEMA to assist in a proposal to obtain temporary lodgings for displaced citizens and disaster workers in support of the Hurricane Katrina disaster relief effort.
- FEMA utilized an existing consulting contract with The Shaw Group (Shaw) to perform market research by, among other things, identifying hotels that might meet the potential lodging needs of the Government's requirements.
- Shaw, however, had no authority to contract on behalf of, or bind, GSA, FEMA or the Federal Government.
- As part of its assistance to FEMA, and pursuant to an oral solicitation, GSA Contracting Officer Georgia Sells had a series of discussions with Decatur's representative, Benjamin Marmande, during the period September 12-29, 2005 to discuss Decatur's ability and willingness to meet the Government's needs vis-à-vis temporary housing.

U.S. General Services Administration
819 Taylor Street
Fort Worth, TX 76102-6195
www.gsa.gov

EXHIBIT
7

tabbies

- Pursuant to these discussions, and at Decatur's request, GSA provided a draft copy of a prospective purchase order to the company. This draft was neither signed by a contracting officer nor did it contain a funding citation. The draft copy was given to Decatur for discussion purposes only.

- During this time, GSA expressly informed Decatur that until and unless FEMA committed monies to fund a contract, GSA could not enter into a contractual relationship with Decatur.

- On September 15, 2005, GSA informed Mr. Marmande that FEMA's temporary housing efforts had been stayed pending internal deliberations involving FEMA, state, and local authorities. On September 22, 2005, FEMA reiterated its decision to suspend its temporary housing efforts.

- On September 28, 2005, FEMA made a final decision to discontinue the process of entering into any new contracts for temporary lodging. In furtherance of that decision, FEMA notified GSA that FEMA would not be funding any such contracts that might be entered into on its behalf.

- On September 29, 2005, Decatur (in the person of Mr. Marmande) was notified that GSA would not be entering into a contract with Decatur to supply temporary housing. This notice was consistent with prior communications with Decatur, occurring on September 15th and September 22nd, that GSA had not yet awarded a contract to Decatur.

The facts above lead me to conclude that there was never a contract between the Government and Decatur. In this regard, Federal Acquisition Regulation (FAR) 48 C.F.R. § 1.602-1(b) states that "[no] contract shall be entered into unless the contracting officer ensures that all requirements of law, executive orders, regulations, and all other applicable procedures, including clearances and approvals, have been met." Additionally, 48 C.F.R. § 1.602.2(a) mandates that contracting officers are to "ensure that sufficient funds are available for obligation" prior to the award of any contract. In this case, FEMA never committed to any funding and, importantly, Decatur had been made aware that absent such a commitment, GSA could not enter into a contract for the lodgings.

Moreover, the parties never executed a signed written agreement. Although characterized as a "formality," your November 16, 2005 letter reflects the parties' mutual understanding that no purported oral understandings would be binding absent a signed written agreement memorializing the understanding:

> [H]e (Mr. Marmande) was told he would have a copy, along with the government equivalent of a P.O. the next day.
>
> * * *

> At the time Decatur was told that the rest of the process was just a formality and final documents would be coming shortly.
>
> * * *
>
> [W]e are just waiting for a signature here and it is definitely a go.

Indeed, in a September 23, 2005 article in the New York Times, Decatur's owner, F. Patrick Quinn III, is reported as admitting that as of the week of the interview, Decatur had not received a firm commitment from it [FEMA] or any other government agency:

> 'It's always tomorrow, tomorrow, tomorrow,' he [Mr. Quinn] said with frustration. The main holdup, he has been told, is the General Services Administration, which is responsible for central purchasing. 'Apparently the people over at G.S.A. think that everybody is running and gunning. And their job is to keep order.'

Attachment A.

Based on the aforementioned facts, I conclude that a contractual relationship between the parties was never established. Therefore, Decatur's claim must be denied.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the General Services Board of Contract Appeals (GSBCA), 1800 F Street, N.W., Washington, D.C. 20405, and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the GSBCA, you may, solely at your election, proceed under the board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less.

Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Alan Searsy
Contracting Officer
Director, MWR & Security Acquisition Division (7FLC)

Close

Date Published: 09/23/2005
Source: *New York Times*
Title: For Hotelier, Crisis Is Another Word for Opportunity

Distributed Date: 09/23/2005

Author: Gary Rivlin

**The New York Times**

September 23, 2005

**For Hotelier, Crisis Is Another Word for Opportunity**

By GARY RIVLIN

For the first few days after Hurricane Katrina hit New Orleans, F. Patrick Quinn III did what he could to help the displaced. He carted food and water to guests stranded at a hotel he owns on the edge of the French Quarter. He even ventured out on a dinghy to help a stranger in a futile attempt to rescue the man's brother, stranded in a flooded section of the city.

But Mr. Quinn, like a number of other entrepreneurs in the storm's path, quickly recognized that Katrina was not just an unprecedented disaster for New Orleans; it was also an unparalleled opportunity for people like him.

Working from dawn to well after dark every day, Mr. Quinn, a prominent local developer, has already made offers on more than 20 hotels in Louisiana and Mississippi to add to the 15 he owns in and around the French Quarter, operating under the name Decatur Hotels.

He has contacted home builders and an urban planner to help him figure out the cost of replacing certain flooded sections of the city with planned communities. And he has purchased more than 5,000 bunk beds to install in empty warehouses he has leased around New Orleans to create makeshift barracks to house cleanup crews and other blue-collar workers.

"My wife kids me all the time," Mr. Quinn, 51, said. "She tells me, 'You're complaining about the hours, but you absolutely love this.' And I do. I do love it."

Mr. Quinn, like hundreds of thousands of people across the Gulf Coast region, has been forced out of his home by Katrina -- and may suffer further setbacks after Hurricane Rita. Unlike most of them, though, he has the resources and initiative to bounce back bigger than ever. And by being so eager to gamble his fortune on the city's future, he could help New Orleans recover all the more quickly.

But Mr. Quinn, known to his friends as Pat, also risks conveying the impression, particularly to the old-money types who still hold such powerful sway in New Orleans, that he is being crass and insensitive to the plight of others.

"People like Pat may come across as opportunistic and crossing the line," said Marc H. Morial, a former mayor of New Orleans who is now president of the National Urban League. "But what you're really seeing is passion. He's passionate about seeing New Orleans come back. Someone like him could just liquidate and move on, but they're not, which is good news for New Orleans."

To those struggling just to get by, Mr. Quinn's sense of opportunity might seem almost otherworldly. Before Katrina, for example, Chawanna Santa Marina was living a comfortable middle-class life as a bank teller married to a man who ran his own siding business.

Today, the Santa Marinas and their two children are 4 of the 32 people stuffed into a four-bedroom home owned by her in-laws here in Baton Rouge.

"We're sleeping on couches; we're sleeping on the floor," Ms. Santa Marina said. "With all the air mattresses, when it's time to go to bed there's no more floor space."

To people like Mr. Quinn, by contrast, the Federal Emergency Management Agency offers not simply a lifeline but the chance of a lifetime.

"With any big disaster, dozens of companies start calling even as the disaster is still taking place," said David G. Passey, FEMA's main spokesman on Hurricane Katrina. "They're looking for a piece of the action, or maybe it's better to say they want a piece of our business."

Mr. Quinn and several associates have joined the stampede. They have already reached out to officials inside FEMA that Mr. Quinn was able to identify through contacts at the Shaw Group, a large, well-connected construction and engineering company based here. Shaw has signed a $100 million contract with FEMA and another of similar size with the Army Corps of Engineers to help with the cleanup and rebuilding.

Mr. Quinn is hoping to persuade FEMA to house a good portion of the workers indefinitely in his newly created temporary barracks. He also hopes to house displaced residents of New Orleans and other affected areas in any of the 21 hotels he said he was negotiating to buy.

"We're giving people 48 hours to make a decision," Mr. Quinn said. Several have already said no. But "three or four look like done deals," he said, and most are still considering the offer despite his "take it or leave it" stance.

Dealing with FEMA, however, takes much longer. As of this week, Mr. Quinn said, he has not yet received a firm commitment from it or any other government agency.

"It's always tomorrow, tomorrow, tomorrow," he said with frustration. The main holdup, he has been told, is the **General Services Administration,** which is responsible for central purchasing. "Apparently the people over at **G.S.A.** think that everybody is running and gunning, and their job is to keep order."

The hurricane has taken a great toll on Mr. Quinn, to be sure. The hotels he owned before the hurricane, while suffering only minor damage, have been without paying customers while he continues to write checks to the scores of people he has already hired to clean them up.

His home in Old Metairie, an exclusive suburb just west of New Orleans, is a white palace whose front exterior, with several Corinthian columns, calls to mind the Pantheon in Rome. It was flooded by three feet of water; a number of precious antiques were destroyed.

Yet through his network of well-heeled friends, Mr. Quinn found a stately two-story brick home to rent in Baton Rouge -- and was then impelled to buy it because the owner was receiving so many enticing offers. The house has a swimming pool, a rose garden and an expansive lawn large enough to hold a touch football game. The ground floor has been converted into makeshift offices for most of the 10 or so people whom Mr. Quinn has put on the payroll to help him carry out his various post-hurricane activities.

"It's dangerous to be one of my friends or a member of my family," he joked. "Everyone is working now."

His oldest son, F. Patrick Quinn IV, 27, whom everyone calls Frank, is in charge of handling the countless requests for housing coming from everyone from law enforcement officials to insurance companies to Wal-Mart.

Because other hotel operators were slow off the mark, the Quinns have also taken on a new business as booking agents, charging other hoteliers a commission for passing along leads.

Their big advantage, Frank Quinn said, is that his father, who spent tens of thousands of dollars on roughly half a dozen satellite phones almost immediately after the flooding began, was already looking ahead to the business opportunities inherent in rebuilding while potential rivals were still in a daze.

"There are a ton of hoteliers that are just waking up," he said, "while we've been running for two and a half weeks already."

A childhood friend of Mr. Quinn's has taken a six-month leave from an executive position to oversee negotiations with FEMA and other federal agencies. Others in Mr. Quinn's circle are filling a range of posts, from the family friend who is serving as one of his two personal assistants to a disbarred lawyer who has long helped Mr. Quinn negotiate the byzantine back hallways of New Orleans government.

"There's tons of opportunity there," Frank Quinn said. "We just have to work hard to capture the business."

The Quinns recognize that there is a fine line between turning a disaster into a business opportunity and exploiting it. Though they could charge far more for their hotel rooms given current market conditions, they say that they have decided to charge no more than $20 above the going government rate of $133 a night a room.

At this time of the year, the Quinns would normally be charging a weekend nightly rate of $179 to $299 a room, they say, depending on the week and the hotel.

"Obviously we're trying to do the best we can for our company," Frank Quinn said. "But there's always the possibility for a win-win. If I can help a customer get into a place to stay a month earlier, he can work a month extra."

Others, however, are not being so reasonable, they say. The elder Mr. Quinn described his experience with a friend, a fellow developer he called one week after the floodwaters hit the city about buying a long-abandoned property.

The property had been listed at $5.5 million for more than a year, Mr. Quinn said. At that price, "nobody wanted it." But when he called one week after the hurricane, his friend's price was $6.5 million.

That bothered Mr. Quinn, but it is not surprising that starkly different conditions of supply and demand have pushed prices up sharply. After all, if Mr. Quinn is able to acquire property at a bargain, there would be nothing to stop him from turning around and selling it to an eager buyer for more.

"There's no doubt in my mind in a free market economy that certain people see a disaster as an opportunity to make a lot of money," said J. Stephen Perry, the chief executive of the New Orleans Convention and Visitors Bureau. "There's no way around it."

In the South, where the legacy of the Civil War still looms large, it is said that a "scallywag" is someone local who takes advantage of a bad situation, while a "carpetbagger" is an outsider who does the same.

It is the carpetbaggers, the elder Mr. Quinn said, who he believes are exploiting

the situation unmercifully. He cited his brief negotiations for a portable shower truck outfitted with eight stalls.

"It was $55,000," Mr. Quinn said. "Before the storm, that truck was probably sitting in storage somewhere, and I'm guessing the guy would have taken $25,000 for it.

"But the guy said, 'You want it, $55,000. If not, I'll sell it to the next guy in five minutes.'"

For his part, Mr. Quinn said he was no kind of scallywag. Not only is he getting lodging ready for workers who are coming in to clean up and rebuild New Orleans, but he is also taking on big risks in the chaotic post-hurricane atmosphere, which could become even worse if the levees fail again because of Rita's impact.

"There's a 50-50 chance I'll come out of this financially better," he said. "But there's a 50 percent chance I'll come out broke."

The New York Times
nytimes.com

PRINTER-FRIENDLY FORMAT SPONSORED BY

October 13, 2005
Housing

# $11 Million a Day Spent on Hotels for Storm Relief

By ERIC LIPTON

WASHINGTON, Oct. 12 - Straining to meet President Bush's mid-October deadline to clear out shelters, the federal government has moved hundreds of thousands of evacuees from Hurricane Katrina into hotel rooms at a cost of about $11 million a night, a strategy local officials and some members of Congress criticize as incoherent and wasteful.

The number of people in hotels has grown by 60 percent in the past two weeks as some shelters closed, reaching nearly 600,000 as of Tuesday. Even so, relief officials say they cannot meet the deadline, as more than 22,000 people were still in shelters in 14 states on Wednesday.

The reliance on hotels has been necessary, housing advocates say, because the Federal Emergency and Management Agency has had problems installing mobile homes and travel trailers for evacuees and has been slow to place victims in apartments that real estate executives say are available throughout the southeast.

Hotel costs are expected to grow to as much as $425 million by Oct. 24, a large expense never anticipated by the FEMA, which is footing the bill. While the agency cannot say how that number will affect overall spending for storm relief, critics point out that hotel rooms, at an average cost of $59 a night, are significantly more expensive than apartments and are not suitable for months-long stays.

Officials in cities from Dallas to Atlanta, which are accommodating thousands of evacuees, give credit for getting 90 percent of the victims out of shelters. But they say they are frustrated by FEMA's record in helping place people in more adequate housing.

"Deplorable. Disappointing. Outrageous. That is how I feel about it," said the Atlanta mayor, Shirley Franklin, a Democrat, in a telephone interview on Wednesday. "The federal response has just been unacceptable. It is like talking to a brick wall."

Even conservative housing experts have criticized the Bush administration's handling of the temporary housing response. "I am baffled," said Ronald D. Utt, a former senior official at the Department of Housing and Urban Development and Reagan administration aide who is now a senior fellow at the Heritage Foundation, the conservative research organization. "This is not incompetence. This is willful. That is the only way I can explain it."

Nicol Andrews, a FEMA spokeswoman, said the federal government was moving as quickly as it could to find temporary housing. But the scale of the catastrophe has made it difficult, she said.

"Clearly we have never encountered the size and scope of a disaster like Hurricane Katrina," she said. "Housing half a million people is a challenge by any standard."

EXHIBIT
tabbies
8

The American Red Cross started the hotel program days after Hurricane Katrina struck, when it became clear that the shelters it had opened were not adequate to deal with the 600,000 to 700,000 families displaced by the storm, a spokeswoman, Carrie Martin, said.

The hotel program was intended to last a couple of weeks but has twice been extended by FEMA. Now Red Cross officials are saying there is no end to the initiative, which pays for 192,424 rooms in 9,606 hotels across the United States, in a range of cities as diverse as Casper, Wyo., and Anchorage, Alaska.

Congress last month appropriated a $62.3 billion for the relief effort, most of it designated for FEMA. The agency had told Congress that it expected to spend more than $2 billion to buy up to 300,000 travel trailers and mobile homes to house displaced residents. The agency also planned to give out $23.2 billion in assistance to victims for emergency needs and for temporary housing and housing repairs.

But the temporary housing program has been troubled since the start, observers say. Instead of setting up as many as 30,000 trailers and mobile homes every two weeks, as of Tuesday, just 7,308 were occupied. Even counting berths on the four ships that FEMA has leased and rooms on military bases and elsewhere, the agency has provided only 10,940 occupied housing units for victims in the three Gulf states.

FEMA, reacting to criticism that it might create super-concentrated slums, has scaled back plans to build so-called FEMAvilles with up to 25,000 trailers.

Even a less ambitious plan - complexes with 200 or so units - has been slow to unfold. FEMA officials cite the reluctance by some rural parishes or landowners to welcome evacuees.

But landowners and some state officials in Louisiana blame bureaucratic fumbles by FEMA. Bill Bacqué, co-owner of a trailer park in Lafayette, La., said he offered property for 45 trailers within days of the storm. Negotiations with FEMA were still under way this week, he said. "Things do not move fast," Mr. Bacqué said.

Late last month, FEMA began handing out $2,358 for three months so that families in shelters or hotels could rent apartments.

To date, more than 415,000 households have been approved for that aid, totaling $979 million. But FEMA officials cannot say how many families have used the money for apartments, or simply spent it on expenses while also living in a government-financed hotel room.

David Degruy, his wife, Debra, and their six children, of New Orleans, have done just that while staying in two rooms paid for by FEMA at the Greenway Inn and Suites in Houston.

"We're trying to save the money so that when do get in a house we'll be able to buy things," Mr. Degruy said. "We eat out sometimes, we buy clothes, personal hygiene things."

Some officials criticize FEMA for a passive approach in dealing with cities and hurricane evacuees.

Representative Barney Frank, Democrat of Massachusetts, who sits on a House panel that helps oversee the housing effort, complained that it was unreasonable for the federal government to expect that a family led by jobless parents, with no car, little savings and little familiarity with a new city could independently find an apartment.

"The administration's policy is incoherent and socially seriously flawed," he said in an interview.

Real estate officials say that although there are few available apartments in Louisiana, there are many vacancies in apartment buildings across the South, including perhaps 300,000 in Texas alone.

"What are these guys doing?" Jim Arbury, an official with the National Multi Housing Council, a group of building owners and managers, said of FEMA. "All of this housing is available now."

Some housing experts say the Bush administration should follow the approach taken after the 1994 Northridge earthquake in Los Angeles, when displaced residents were given prepaid housing vouchers instead of having to negotiate and pay a lease on their own.

"We are wasting money hand over fist because we did not deploy the right policy tools," said Bruce Katz, a vice president at the Brookings Institution, a liberal research group in Washington. "We could have thousands, if not tens of thousands of families, in stable permanent housing right now. And we would not have to turn to these costly measures, like hotels, motels and cruise ships."

Ms. Andrews, the FEMA spokeswoman, defended the housing policy. "The program is designed to give those who it affects the most the control over their own lives," she said.

Some cities, including Houston and San Antonio, have taken an active role in helping families find housing by creating their own voucher program, identifying vacant units, paying for six-month leases and then turning over the unit to the evacuees. FEMA has promised to reimburse the cities for the housing costs.

"You can't just give people a check and say, 'Good luck, we will see you,' " said San Antonio's assistant city manager, Christopher J. Brady. "It would not be a sufficient solution."

FEMA officials said other cities can set up similar programs. But Mayor Franklin of Atlanta and Mayor Laura Miller of Dallas have said they cannot do so without being paid in advance by the federal government.

Expressing frustration that she could not offer more help to the 39,000 displaced people who have come to Georgia, Mayor Franklin said FEMA's expectations that her city could advance housing money were unrealistic.

"Our government is not large enough to do that," she said. "We can't absorb the costs."

Thayer Evans contributed reporting from Houston for this article, Lily Koppel from Baton Rouge, and Andy Lehren from New York.

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Con